**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

ARABELLA HOLZAPFEL,

      Plaintiff,

  v.                           Civil Action No.

PRESIDENT AND FELLOWS OF
MIDDLEBURY COLLEGE,

      Defendant.

**COMPLAINT**
**JURY TRIAL REQUESTED**
**INJUNCTIVE RELIEF SOUGHT**

NOW COMES the Plaintiff, Arabella Holzapfel ("Plaintiff" or "Ms. Holzapfel"), by and through undersigned counsel, and complains against the Defendant, President and Fellows of Middlebury College ("Defendant, "Middlebury," or "Middlebury College"), as follows:

**INTRODUCTION**

1.     This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§1681, *et seq*., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*., the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Vermont Fair Employment Practices Act ("VFEPA"), 21 V.S.A. § 495, *et seq*.

2.     Defendant subjected Plaintiff to unequal pay and pay discrimination because of sex and age from at least 2001 through Plaintiff's retirement on June 27, 2024.

3.     Plaintiff brings this suit against Defendant for violating her right to equal pay and to be free from pay discrimination because of sex and age. For such violations, Plaintiff seeks compensation for her economic losses, stress, anxiety, humiliation, and other non-economic losses, attorney's fees and costs, and other appropriate relief.

**PARTIES AND JURISDICTION**

4.    Ms. Holzapfel is a United States citizen residing in the Town of Ferrisburgh, State of Vermont.

5.    Middlebury College is a private college located in the Town of Middlebury, State of Vermont.

6.    Defendant had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar years as when the alleged discrimination occurred.

7.    Defendant had about 2,100 employees as of June 2024.

8.    Defendant is a program or activity that receives federal financial assistance including but not limited to Pell grants.

9.    This Court has subject matter jurisdiction over Ms. Holzapfel's federal and state law claims pursuant to 28 U.S.C. §§ 1331 and 1367.

10.    On or about July 13, 2023, Ms. Holzapfel filed a timely Charge of Discrimination against the Defendant alleging unlawful age and sex discrimination and equal pay violations with the Equal Employment Opportunity Commission ("EEOC").

11.    On or about June 24, 2024, the EEOC issued a Notice of Right to Sue with respect to Ms. Holzapfel's federal law claims.

12.    Ms. Holzapfel has exhausted her administrative remedies with respect to all claims set forth herein requiring administrative exhaustion.

**JURY TRIAL DEMAND**

13.    Plaintiff requests a trial by jury of all issues triable of right by a jury.

**FACTUAL BACKGROUND**

14.    Middlebury College is a private liberal arts college in Middlebury, Vermont.

15.     Ms. Holzapfel is female.

16.     Ms. Holzapfel was born in 1957.

17.     Ms. Holzapfel has a Bachelor's degree in physics with a minor in biochemistry. She studied electrical engineering at the graduate level.

18.     Ms. Holzapfel started working in libraries in late 1991. Her first job in a library was as a part time children's librarian at the Bixby Library in Vergennes, Vermont.

19.     In November 1992, Ms. Holzapfel was hired as a Science Library Assistant at Middlebury College. She worked at Middlebury College libraries for close to 32 years by the time she retired in June 2024.

20.     In April 1994, Ms. Holzapfel was promoted to full-time work as a Catalog Associate in the Catalog Department at the Starr (main) library. Cataloging requires attention to detail as well as an understanding of how things fit together into the bigger picture. While working in the Catalog Department, in terms of responsibility, skill, and effort, Ms. Holzapfel's work was equivalent to another Catalog Associate, Mr. M.W.

21.     In late 1999, Ms. Holzapfel's supervisor gave her more complicated cataloging duties and promoted her to Serials and Computer Resources Cataloger. Ms. Holzapfel's responsibilities increased, and she received a 3.2% pay raise.

22.     In early 2001, Ms. Holzapfel transferred to a job as Senior Library Assistant at the Armstrong library. This position oversaw the circulation desk and was responsible for hiring and training the students who staffed the circulation desk.

**Pay Discrimination**

23.     In late 2001, Ms. Holzapfel started working with periodicals when she transferred to Serials Assistant at the Starr library. She unpacked print periodicals, checked them in, made sure no issues were missed, claimed issues that were missed, labeled periodicals, shelved them, and

prepared them to be bound. Ms. Holzapfel also hired and trained a student assistant.

24.    If there was no sex discrimination at play, Ms. Holzapfel would have been placed in the Serials Assistant position at a wage level that would later be designated as Specialist 1 instead of Operations 3. At that time (2001), Ms. Holzapfel had 10 years of experience in similarly specialized library jobs, so her wage should have been at the low end of the upper third of the range for Specialist 1. Instead of earning $14.92/hour, she should have been earning $15.60/hour.

25.    In 2001, the library was merged with Information Technology Services and became Library and Information Services ("LIS").

26.    In 2005, Middlebury College developed an affiliation with the Monterey Institute of International Studies (MIIS) in Monterey, California. In 2010, Middlebury College officially acquired the Institute, and it became the Middlebury Institute of International Studies at Monterey.

27.    In the early- to mid-2000's, Middlebury College began to shift more and more of their print periodicals to online access. Ms. Holzapfel's work with print periodicals decreased and her work with online access to journals increased.

28.    Ms. Holzapfel's evaluations document that she took on additional responsibilities throughout 2002-2009.

29.    At some point between July 2008 and March 2009, Ms. Holzapfel's job title changed from Serials Assistant to Periodicals Coordinator.

30.    The Periodicals Coordinator job required higher levels of effort, skill and responsibility – taking over print journal subscriptions, and helping with certain aspects of online access – yet Ms. Holzapfel's pay increase that year was the 2% given to everyone making under $50,000 annualized.

31.    Bill Warren, male, now retired, was Ms. Holzapfel's supervisor when her title changed to Periodicals Coordinator.

32.     If there was no sex discrimination at play, when Ms. Holzapfel's title changed to Periodicals Coordinator, her wage would have been placed in the middle third of the Specialist 2B band instead of the middle third of the Operations 4 band in recognition of the additional responsibilities she had taken on. Instead of earning $21.89/hour (a 2% across-the-board raise from the $21.46 she had been earning as Serials Assistant), Ms. Holzapfel would have earned $26.64 per hour and her position would have been salaried and exempt.

33.     In 2010, when Mr. Warren retired, Ms. Holzapfel took on much of Mr. Warren's non-supervisory work including negotiating and signing license agreements, being responsible for every detail of online access to journals and databases, while her job title remained Periodicals Coordinator. Ms. Holzapfel also continued performing her previous work of managing the print periodicals collection. She was managing subscriptions that totaled well over $1M at the time.

34.     However, Ms. Holzapfel did not receive a pay raise that compensated for her increased duties and responsibilities.

35.     Ms. Holzapfel was performing the work of an Electronic Resources Librarian but her supervisor, Terry Simpkins, male, and Middlebury College as a whole, did not give her the job title or pay that she deserved. Ms. Holzapfel was by then performing job duties that had been assigned to her recently retired supervisor (a male who was salaried and was likely earning at least 50-75% more than her).

36.     In Ms. Holzapfel's performance evaluation[1] dated March 2011, Mr. Simpkins wrote, "I want to now advocate for a revised job description and have her salary reviewed for

---

[1] Annual performance evaluations happened at Middlebury in the spring of each year since at least 2006 through 2019. In early 2020, annual performance evaluations were waived due to restrictions and work process anomalies that resulted from Covid. With the revised compensation program, annual performance evaluations were replaced by "Quarterly Conversations," during which a supervisor and employee discuss (a)What are the employee's work-related strengths?, (b) What are the employee's work-related opportunities?, (c) What are the employee's near- or long-term goals?

fairness." Ms. Holzapfel's evaluation stated that she "significantly exceeded expectations."

37.     In May 2011, Ms. Holzapfel's job description was updated and her title changed to Subscriptions and E-Resources Coordinator. She remained an hourly employee.

38.     Ms. Holzapfel was given a 3.5% raise to $23.11 per hour and $785 in back pay (tied to the updated job description and title change).

39.     Effective in July 2011, Ms. Holzapfel received another 4.5% raise (tied to the "significantly exceeded expectations" rating in March 2011), bringing her hourly pay to $24.15.

40.     If there was no sex discrimination at play, Ms. Holzapfel's job responsibilities would have been recognized as deserving of placement in the middle third of the Specialist 3B band and her hourly rate for her salaried, exempt job would have been $30.23 per hour.

41.     Rebekah Irwin, female, became Ms. Holzapfel's supervisor after July 2011.

42.     In February 2012, less than a year after Ms. Holzapfel's job description was ostensibly "updated", Ms. Irwin wrote in Ms. Holzapfel's evaluation, "I will ensure that her job description accurately reflects her day-to-day realities and that her pay is commensurate with her responsibilities."

43.     Ms. Irwin's remark demonstrates that an unbiased person with experience at a variety of other libraries (including Yale's) recognized that Ms. Holzapfel's compensation was inadequate for the level of contributions she was making to the organization.

44.     Ms. Holzapfel's job description was updated in about October 2013.

45.     Ms. Holzapfel was promoted to a salaried position as the Electronic Resources Manager & Library Systems Specialist, taking on essential duties from the recently retired Library Systems Assistant. (She assumed responsibility for updating the library's periodical holdings for certain InterLibrary Loan systems and load profile maintenance for the library's database system, the latter of which required several days of specialist training in Providence, Rhode Island.) Ms.

Holzapfel's job was placed in the middle third of the Specialist 3 band, exempt. She received a 12% raise and her annual salary was $57,230.

46.    With the amount of experience and responsibility Ms. Holzapfel had by 2013, and if sex discrimination had not depressed her wages earlier in her career, she would have been placed in the upper third of the Specialist 3B band making $68,747.

47.    To summarize the pay discrimination that occurred during the 2002-2013 period:

> Ms. Holzapfel took on more and more responsibility as print journals moved online – far more than any previous Serials Assistant had needed to do – yet her male manager (Bill Warren) did not see fit to increase her pay.

> When Mr. Warren left, Ms. Holzapfel took on much of Mr. Warren's job duties and her new male manager (Terry Simpkins) realized he had to do something and managed to get it upgraded from Ops 3 to Ops 4 and a 3.5% raise.

> Then Rebekah Irwin, a new manager – female – almost immediately arranged to get Ms. Holzapfel's job upgraded to Specialist 3 and a 10% raise.

48.    In 2014, LIS "un-merged" and the Library and Information Technology Services were placed in separate reporting structures. The former Dean of LIS became Dean of Library.

49.    In 2014 - 2016, Ms. Holzapfel studied for and attained a Master of Science degree in Mediation and Applied Conflict Studies.

50.    In 2018, Ms. Holzapfel received an "exceeds expectations" performance rating and 4.5% raise. Her salary increased to $64,650 per year.

51.    In 2020, Mr. Simpkins became Ms. Holzapfel's supervisor again.

52.    In FY 2022-2023, Middlebury changed from a merit system for awarding pay increases to a capped market-based salary range with individual skills matrix and discretion.

53.    In July 2022, Ms. Holzapfel was given a discretionary raise and her pay increased by 2.9% to $69,900.

54.    Throughout her employment, Ms. Holzapfel provided services to Middlebury and

the broader communities that went above and beyond her formal job duties.

55.     From about 1996 to 2000 and 2010 to 2014, Ms. Holzapfel served on the Middlebury College Staff Council.

56.     From about the mid-90s to mid-2000s, Ms. Holzapfel led four or five Toastmasters-based "Speechcraft" public speaking workshops for staff and faculty at Middlebury College. Each workshop lasted six weeks. There were usually five to ten people in each group.

57.     From about 2005 to 2010, at various times Ms. Holzapfel served on the Staff Appeals Panel and as Ombudsperson.

58.     From 2013 to the present, Ms. Holzapfel has served on the Planning Commission for the Town of Ferrisburgh.

59.     From 2013 to the present, Ms. Holzapfel has served as one of three delegates from the Town of Ferrisburgh to the Addison County Regional Planning Commission (ACRPC).

60.     From about 2011 to 2022, Ms. Holzapfel attended the Innovative Users Group conference at least three times, twice in Chicago, once in San Francisco. She also attended the Electronic Resources in Libraries conference twice, once in Austin, Texas; the 2022 conference was online.

61.     In August 2014, Ms. Holzapfel traveled to Monterey, California, to work with MIIS Library's Assistant Director and other MIIS staff to better coordinate how e-resources at Middlebury and MIIS were handled.

62.     From July 2014 to June 2016, Ms. Holzapfel served as Middlebury College's first Staff Constituent on the College Board of Overseers of the Board of Trustees.

63.     In June 2016, Ms. Holzapfel received a Staff Recognition Award from President Laurie L. Patton. She wrote:

> "Arabella- For nearly a quarter of a century, you have worked tirelessly to make the library, the College, and the Addison County community a better place for everyone.

8

In your position as electronic resources manager, you exercise great care in handling the library's many licensing contracts, and as library systems specialist, you make certain that students, faculty, and staff always have access to the online data they need. You have served with distinction as a constituent overseer to the Middlebury Board of Trustees, and as the Davis Library's representative to Staff Council your colleagues marvel at your internal communication skills and your high level of preparedness for monthly meetings. Outside of the College you have served nobly on the Town of Ferrisburgh's planning commission, which is currently re-writing the town plan, and you have devoted significant energy to helping youthful offenders through the Addison County Court Diversion Program. As an individual who epitomizes the mutually beneficial relationship between town and gown, we are pleased to present to you, Arabella, this 2016 Staff Recognition Award."

64.     During 2020-2021, Ms. Holzapfel served as Treasurer for the Addison County Communications Union District, dba Maple Broadband.

65.     From 2022 to the present, Ms. Holzapfel has served as the representative from ACRPC on the Otter Creek Basin Water Quality Council; she is currently chairing the Council.

66.     From 2022 to the present, Ms. Holzapfel has served on the Executive Board of the ACRPC.

67.     From April 2023 to the present, Ms. Holzapfel has served on the Ferrisburgh Climate and Energy Committee.

68.     On June 21, 2023, Ms. Holzapfel received a salary letter from Cailin Goss, Vice President for Human Resources & Chief People Officer at Middlebury College. She was told that effective July 1, 2023, her new salary would be $72,347, which was a 3.5% increase. The letter read in part:

"Role: Overall, our assessment showed that the market has moved an average of 3.5 percent in the past year, which is reflected as an increase across all pay ranges. Based on this, your annual increase is $2,447, which is 3.5 percent of your previous rate. Your position remains in grade VT-6.

"Individual: Skill matrix changes are reflective of major milestones in the overall progression of a staff member's career. Your skill matrix placement did not change this year and continues to be Thriving.

"Discretion: Discretionary increases are determined by the leadership in each area and provide an additional method to recognize employees. You did not receive a

discretionary increase this year, but you will continue to be eligible for discretion in future years in addition to the other parts of the program."

69.      Using the U.S. Bureau of Labor Statistics CPI Inflation Calculator, the salary that Ms. Holzapfel received starting in October 2013 – $57,230 – is now worth $74,525 (as of May 2023, the most recent data available). While performing at a high level, and consistently serving Middlebury College beyond her job's duties, Ms. Holzapfel has not been rewarded in a manner that has even kept up with inflation.

70.      Ms. Holzapfel's compensation did not accurately reflect her individual merit.

71.      Ms. Holzapfel's skill matrix placement should have been "Leading in the role" not just "Thriving in the role".

72.      The rating did not reflect Ms. Holzapfel's contributions as reflected in her performance evaluations as well as multiple appointments and awards.

73.      In addition to making sure that users had access to over $2M worth of subscribed online resources, Ms. Holzapfel was the functional lead on a team that was steering a migration to a new library database system. Ms. Holzapfel was Middlebury's library representative on the E-Resources Team of a newly forming subgroup of the Boston Library Consortium that will soon be sharing these library systems and also consortially purchasing access to e-resources. Further, Ms. Holzapfel was asked to train her successor.

74.      Middlebury's compensation program defines four criteria to be met to be deemed "leading in the role". The four criteria are listed below in subparagraphs a through d. Following each criterion are excerpts from Ms. Holzapfel's annual performance evaluations and quarterly conversations that document her attainment of the criterion.

a.   "Requires only direction on where the work is going, not how to get there."

i.   Specific example: The library's budget for collections decreased in fiscal year 2018. The library needed to identify subscribed resources

(which have ongoing costs each year) to eliminate, and cancel them. In Ms. Holzapfel's evaluation the following year, her supervisor described the many tasks she performed throughout the process – all of which Ms. Holzapfel devised without needing the direction of her manager. Following that, her supervisor wrote, "These particular labors were essential to the success of the project, and she deserves a lot of the credit for the library's $107,000 worth of reductions in e-resource expenditures." – Douglas Black in Ms. Holzapfel's performance evaluation, dated March 27, 2018.

    ii. More generally, Ms. Holzapfel's work is specialized and encompasses multiple systems, platforms, and technologies. The managers who gave her direction on "where the work was going" rarely knew "how to get there."

b. "Provides leverage within and across the organization"

    i. "I have valued highly my close working relationship with Arabella and I am a better librarian due to her willingness to share her expertise with me." – Rebekah Irwin in Ms. Holzapfel's performance evaluation, dated March 24, 2014.

    ii. In October 2014, the library sent Ms. Holzapfel to Monterey, California, to begin a process of coordinating access to e-resources for both Middlebury College and the Middlebury Institute of International Studies. Ms. Ann Flower, then the Assistant Director of MIIS, wrote to Mr. Simpkins, "Thanks to Arabella, I feel we have a seat at your conference table when you and your team discuss and

make decisions about e-resources." -- Quoted in Ms. Holzapfel's performance evaluation dated March 2015.

  iii. In Ms. Holzapfel's Quarterly Conversation of March 2024 with her then supervisor, Ms. Julie Adamo, Ms. Adamo said that one of Ms. Holzapfel's work-related strengths was her ability to tailor her communications to a variety of audiences – students new to Middlebury, long-term faculty, library colleagues, outside vendors. Ms. Adamo said that observing this strength in Ms. Holzapfel helped her understand how vital a skill it will be as she began recruiting for Ms. Holzapfel's replacement.

c. "Delivers stellar results, again and again."

  i. "She basically performs what in many libraries would be an 'acquisitions librarian' role, and as such she is extremely proactive, communicates directly with liaisons and MIIS, sets up trials, keeps Summon [discovery system] up to date, provides financial data on request, and was instrumental in helping me with some of the use and cost analyses I prepared this year." – Terry Simpkins in Ms. Holzapfel's performance evaluation dated March 19, 2015.

  ii. "Arabella is a very high performer, with initiative and a very deep skillset that she applies energetically to her work. She's a genuine asset to the College, and I value her contributions highly." – Douglas Black in Ms. Holzapfel's performance evaluation dated March 13, 2019.

d. "Exhibits the highest level of mastery as an independent sought-after

leader."

    i.   Ms. Holzapfel was elected by her colleagues to serve on the Middlebury Staff Council for a total of four 2-year terms, 1996-2000 and 2010-2014.

    ii.   Ms. Holzapfel was appointed by the president to serve as Ombudsman for several years around 2005-2010.

    iii.   Ms. Holzapfel was appointed by Middlebury President Ron Liebowitz to be the first Staff Constituent on the College Board of Advisors when the structure of the Board of Trustees was revamped in 2014.

    iv.   As referred to above, in June 2016, Ms. Holzapfel received the Staff Recognition Award.

75.    If there was no sex or age discrimination at play, Ms. Holzapfel would have been rated as "Leading in the Role" and given a discretionary increase.

76.    A reasonable person would realize that Ms. Holzapfel's duties (above and beyond her full-time job of making sure library users have access to over $2M worth of subscribed online resources) constituted "Leading in the Role."

77.    Ms. Holzapfel's skill matrix placement was underrated because of her sex and age.

78.    Ms. Holzapfel was denied a discretionary increase in 2023 because of her sex and age.

79.    This was a knowing violation of Ms. Holzapfel's rights given Ms. Holzapfel's conversations with her supervisor and the Dean of Library about being underpaid.

80.    In 2023, Ms. Holzapfel's direct supervisor was Terry Simpkins, Director of Discovery and Access Services.

81.     The Dean of Library was Mike Roy.

82.     In late Spring of 2022, during their monthly 1:1 meetings, Ms. Holzapfel started discussing with Mr. Simpkins a succession plan for her retirement which she was aiming for in the next couple of years.

83.     Mr. Simpkins suggested that maybe Mr. D.F. could take on Ms. Holzapfel's role.

84.     Mr. D.F. was the Circulation Services Manager.

85.     Ms. Holzapfel told Mr. Simpkins she thought that was a fine idea.

86.     In the Fall of 2022, Mr. Simpkins asked if Ms. Holzapfel might allow Mr. D.F. to "look over [her] shoulder" so that he could decide if he might be interested in her job. Mr. Simpkins remarked that Mr. D.F. is "bright" and could handle the work that Ms. Holzapfel does. He also mentioned that Mr. D.F. was "under-utilized in his current position."

87.     In early February 2023, Mr. Simpkins set up a meeting with Ms. Holzapfel and Mr. D.F.. The subject line of the appointment was "E-Resources/Systems Succession Planning", which makes it clear that Mr. Simpkins envisioned Mr. D.F. moving directly into Ms. Holzapfel's job with the duties and responsibilities it had at the time.

88.     Over the next few months, Ms. Holzapfel worked with and trained Mr. D.F..

89.     As Ms. Holzapfel trained Mr. D.F., she came to realize that she has a very high level of expertise after working for 20 years with various aspects of journals, subscriptions, online access, and licensing.

90.     Ms. Holzapfel realized that it would take a significant amount of training to allow Mr. D.F. to assume her job duties even at a "Learning in the role" level of the skill matrix.

91.     At her April 2023 1:1 meeting with Mr. Simpkins, Ms. Holzapfel asked if Mr. D.F. seemed interested in her job. Mr. Simpkin's response was, "He's interested, it's just a matter of salary."

92.     Ms. Holzapfel realized that Mr. D.F. was making a higher salary than her.

93.     Upon information and belief, Mr. D.F. was making about $80,000 per year.

94.     As Ms. Holzapfel thought about the expertise she gained over the last 13 years (and after working for 30 years in the library), the more she resented having to come up with a training program for Mr. D.F., on top of her other duties described above, when his only experience relevant to her job would be the training that she provided him.

95.     Ms. Holzapfel was also humiliated to learn that Mr. Simpkins was just fine with Mr. D.F. making more money when he started doing Ms. Holzapfel's job than she was making after 13 years doing that work (as well as closely related work for another 10 years before that).

96.     About two weeks after Ms. Holzapfel's April 2023 meeting with Mr. Simpkins, eight Middlebury library employees – Mike Roy (Dean), Terry Simpkins (Director), Mr. B.C. (Systems Librarian), Mr. D.F. (Circulation Services Manager), Ms. Holzapfel, one other man and two other women– went to Hartford, Connecticut, for a meeting to kick off the Boston Library Consortium subgroup referred to above.

97.     On the morning of the second day, Ms. Holzapfel learned from Mr. B.C. that Mr. D.F. took his boss, Mr. Simpkins, and two male employees out for whiskey-tasting after the baseball game the previous night. No women were invited.

98.     In early May 2023, Ms. Holzapfel had a monthly meeting with Mr. Simpkins. They gathered agenda items on a google doc beforehand. Ms. Holzapfel put "Succession" as the last item on the agenda. When they got to that item during the meeting, Ms. Holzapfel asked Mr. Simpkins, "it sounds like [Mr. D.F.] makes more money than me, right?" He affirmed that fact. Ms. Holzapfel told Mr. Simpkins how upset she was at the prospect of training Mr. D.F. to do her job knowing that he would make more money when he started than Ms. Holzapfel was making after doing the job for 13 years. Ms. Holzapfel told Mr. Simpkins that she felt demoralized and humiliated. He apologized

profusely. He said that he had a high regard for Ms. Holzapfel's skills and that he "loves working with" her. By the end of the meeting, they were laughing, and Mr. Simpkins said he would have to think about what to do next.

99.    Upon information and belief, Mr. Simpkins did not investigate Ms. Holzapfel's concerns, and did not take any corrective action.

100.    A couple of days later, Ms. Holzapfel emailed Mr. Roy and wrote: "I'd like to talk with you about something I'm pretty upset about. It pertains to how Terry [Simpkins] has been approaching 'succession planning' after my retirement. I have voiced my feelings about it with Terry. I would like to talk to you about it to get your perspective, and whether I need to be 'talked down' (i.e., I need to shift my perspective) or if my upset is justified (which it really feels like it is). We can meet on Zoom or I can come in for an in-person chat at your convenience, whatever you prefer."

101.    Ms. Holzapfel met with Mr. Roy in person on May 9, 2023.

102.    The first thing Mr. Roy said is that he had talked to Mr. Simpkins about the situation, and he wanted Ms. Holzapfel to be aware of that.

103.    During the conversation, Ms. Holzapfel summarized her perspective on the situation, stating how deeply unfair she found it that Mr. Simpkins is willing to move Mr. D.F. into her job at a higher rate of pay when he started than Ms. Holzapfel was making after more than a decade. Ms. Holzapfel also explained how clear it had become that Ms. Holzapfel's expertise had been gained from decades of experience, and that she resented having to come up with a training program for Mr. D.F. on top of all the other responsibilities she had.

104.    Mr. Roy said that the current compensation program would not allow Mr. D.F. to be moved directly into Ms. Holzapfel's job at his current pay rate, but that she should not be surprised if a new position was created that had some aspects of her job and additional

responsibilities that took advantage of Mr. D.F.'s skills and experience.

105.     Ms. Holzapfel asked Mr. Roy, "Surely someone who is being asked to train someone else is 'Leading in the role'?"

106.     Mr. Roy shook his head and responded, "Since you're retiring soon and we are limited in how many people we can promote,..."

107.     During this conversation, Mr. Roy also said, "[Mr. D.F.] has a kid starting college, so of course he doesn't want to take a pay cut."

108.     Mr. D.F. is male and significantly younger than Ms. Holzapfel with a child about to start college.

109.     Ms. Holzapfel is female and was nearing retirement age.

110.     Mr. Roy/Middlebury College was willing to create a new job with new job duties for Mr. D.F. to justify paying him significantly more than Ms. Holzapfel.

111.     Mr. Roy/Middlebury College did not suggest that they could add new duties or responsibilities to Ms. Holzapfel's job to bring her compensation in line with a much younger male employee.

112.     There is other evidence of discrimination in pay/compensation from the 2023 pay raises.

    a.  Mr. M.W. (male), Senior Catalog Associate, did not receive a base pay increase but he did receive a discretionary bonus that, as he said, "pleasantly surprised" him. (Because Mr. M.W.'s current salary was above the maximum of his pay grade in the new compensation system, he was not eligible for a raise to his base salary; he was eligible for a one-time discretionary lump sum 'bonus' and did receive one.)

       Mr. M.W. is close to Ms. Holzapfel in age, yet Dean Roy did not use Mr. M.W.'s imminent retirement against him when doling out discretionary bonuses. Ms. Holzapfel was subjected to intersectional discrimination because of her status as an older female.

    b.  Ms. M.M. (female), Senior Acquisitions Associate, did not receive a base pay increase either – nor did she receive a discretionary raise or bonus.

113.     Nine people reported directly to Mr. Simpkins. Three of them were male. Upon information and belief, all three men made significantly more (>$5,000 per year) than any of the six women.

114.     Ms. M.E. (female) is one of the women who reported directly to Mr. Simpkins. Ms. M.E. is the Catalog, Metadata and Materials Processing Specialist. In the same way that Ms. Holzapfel was Middlebury's representative on the E-Resources Team of the budding consortium, Ms. M.E. is Middlebury's representative on the Cataloging Team. Also, in the same way that Ms. Holzapfel was a functional lead for E-Resources in the library system migration process, Ms. M.E. is a functional lead for Cataloging in the library system migration process. Ms. M.E.'s position is placed in grade VT-3 while that of Mr. M.W., male, Senior Catalog Associate, who is not assigned to take on either of these duties, is placed in grade VT-5.

115.     Ms. Holzapfel looked at five positions affected by Middlebury's transition from the previous merit-based compensation system to the current market-based compensation system. Ms. Holzapfel's job was the only one for which the new pay range (VT-6, in her case) had a higher minimum, mid-point, and maximum ($51,241, $64,037, and $76,913, respectively, effective July 2022) than her pay range in the previous compensation structure (Specialist 3, in her case – for which the minimum, mid-point, and maximum were $46,304, $61,357, and $76,409, respectively, effective July 2021). This indicates that Ms. Holzapfel was previously underpaid.

116.     Some of the words and actions of Middlebury managers that support an inference of sex and age discrimination include the following:

   a. Mr. Simpkins informed Mr. M.W. that upon his (M.W.'s) imminent retirement he (Simpkins) would like to replace Mr. M.W.'s position (Senior Catalog Associate) with a Catalog Librarian whereas Ms. Holzapfel's position could be replaced by Mr. D.F., a Circulation Supervisor.

   b. Middlebury College planned to replace Ms. Holzapfel's Specialist position (Electronic Resources Manager and Library Systems Specialist) with a Librarian position (Electronic and Continuing Resources Librarian).

c. Mr. Simpkins asked Ms. Holzapfel to train Mr. D.F., knowing that Mr. D.F. was being paid more than Ms. Holzapfel and was unwilling to take a pay cut to take on her work, and knowing that Mr. D.F.'s only relevant experience for the job would be the training he received from Ms. Holzapfel.

d. Mr. Simpkins' inability to grasp that Ms. Holzapfel was "Leading in the role" in the spring of 2022, and his continued inability to see that she was "Leading in the role" or deserving of a discretionary raise in spring of 2023, demonstrates sex discrimination.

e. Mr. Roy was dismissive when, in May 2023, Ms. Holzapfel inquired about being rated as "Leading in the role". His comment - "you're retiring soon" – is evidence of age discrimination. During the same conversation, Mr. Roy empathized with a younger male employee's financial well-being by commenting that "[Mr. D.F.] has a kid starting college, so of course he doesn't want to take a pay cut." It is a sexist trope that men are the breadwinners for their family and that women work for "pin money".

**Unequal Pay**

117. For many years, Middlebury College has been paying Ms. Holzapfel lower wages than it paid male employees for equal work in jobs that have substantially equal or lesser requirements relating to skill, effort, and responsibility.

118. Federal and state equal pay laws require that men and women in the same workplace be given equal pay for equal work. The jobs need not be identical; they must be substantially equal. Job content (not job titles) determines whether jobs are substantially equal.

119. Comparator #1: Mr. B.C. (male), late 50's, Systems Librarian, as of 2023:

a. Pay:
    i. Mr. B.C.'s pay was likely about $90,000 per year.
    ii. Ms. Holzapfel's pay (prior to July 2023) was $69,900.

b. Education and experience:
    i. Mr. B.C.'s position required an MLS degree plus three years of library experience, preferably in an academic setting.
    ii. Ms. Holzapfel's position required a Bachelor's degree, and an MLS degree or equivalent experience is preferred; five- to eight-years' experience in academic libraries is required.
    iii. It is worth noting that Mr. Roy, Dean of Library, does not hold an MLS degree.

c.  The core responsibilities of the two jobs have substantially equal requirements relating to skill, effort, and responsibility.

    i.  They were both deeply familiar with the most critical library systems' functions; they cover for each other on vacations, etc.

    ii.  When Ms. Holzapfel was away from work, her out-of-office message directed correspondents with urgent questions to Mr. B.C.

    iii.  When Mr. B.C. was away from work, his out-of-office message directed correspondents with urgent questions to Ms. Holzapfel.

    iv.  They both had authority to communicate with the library database system vendor; upon information and belief, only one other person in the library (Mr. D.F.) shared that authority.

    v.  Their jobs were both highly technical. There was a fair amount of overlap in technical skills required.

    vi.  They both needed to be facile with the ITS department's support ticket system through which users communicated problems with computers, networks, etc.; they were both in the group of four library staff who were notified when an ITS support ticket was identified as pertaining to the Library.

    vii.  They were both trained on arcane procedures necessary for the library's database system to function (load profile maintenance). Mr. B.C. and Ms. Holzapfel were the only staff members at Middlebury who received this training.

    viii.  They collaborated closely on many things, most notably system migrations.

    ix.  Both jobs were essential to providing access to the library's online resources.

    x.  They were both proficient with administering the authentication systems – the systems that essentially sit between Middlebury and content providers, through which Middlebury's users could be identified by the content provider as having access to Middlebury's licensed resources. Mr. B.C. and Ms. Holzapfel were the only staff members who had essential roles in administering the authentication systems and providing online access to resources.

    xi.  The Library Systems Assistant who retired in 2013 (referred to above) had compiled a Word document of instructions for herself over the 20 years that she held that position. When she retired, she gave Mr. B.C. and Ms. Holzapfel access to that document which they continued to refer to and revise for tasks that were required on an irregular or infrequent basis. Mr. B.C. and Ms. Holzapfel were the only staff members who used and revised that document.

    xii.  Both jobs were very similar with regard to "impact of the employee's exercise of his or her job functions on the employer's business".

    xiii.  Both jobs acted without supervision.

    xiv.  Neither job involved the supervision of other employees.

    xv.  For most of the last 13 years of employment, Ms. Holzapfel negotiated and signed license agreements, which committed Middlebury to paying for subscriptions (nearly $2M per year) and to additional terms in the agreements. Upon information and belief, the Systems Librarian did not have any authority with respect to signing licenses.

xvi.   With respect to online access, imagine a line with the vendors of library resources on the left end, Middlebury's users on the right end, and the authentication systems in the center. Ms. Holzapfel's job focused mostly on the left side of the line - providing external vendors with the information they needed to interface with the Library's authentication systems as well as signed license agreements, subscription payments, etc., all of which were necessary for Middlebury users to access the Library's resources. Mr. B.C.'s job focused mostly on the right end of the line - making sure user data from Middlebury's enterprise systems (e.g., whether a user is a faculty member, retiree, or alumnus, etc., and affiliated with the undergraduate college, MIIS, or Schools Abroad, etc.) were accurately transmitted to the authentication system. Ms. Holzapfel and Mr. B.C. were both required to understand the fundamentals of what happened all along the line.

xvii.   Ms. Holzapfel specialized in understanding systems necessary for acquisitions and cataloging. Mr. B.C. specialized in understanding systems related to InterLibrary Loan and the "back end" of public-facing library interfaces (online catalog, primarily).

120.   Comparator #2: Mr. D.F., male, much younger, Circulation Services Manager, as of 2023:

a.   Pay:
  i.   Mr. D.F.'s pay was likely about $80,000 per year.
  ii.   Ms. Holzapfel's pay (prior to July 2023) was $69,900.

b.   Education and experience:
  i.   Mr. D.F.'s position required a Bachelor's degree or equivalent experience with broad liberal arts knowledge and five years of progressively responsible management experience.
  ii.   Ms. Holzapfel's position required a Bachelor's degree, and a Master of Library Sciences ("MLS") or equivalent experience was preferred; five- to eight-years' experience in academic libraries was required.

c.   The core responsibilities were different but had substantially equal requirements relating to skill, effort, and responsibility.
  i.   They were both capable of extracting data and information from the library database system.
  ii.   They were both functional leads on the system migration, and the consortium activities described above.
  iii.   Mr. D.F. was one of three library staff members who was authorized to contact the library database system vendor directly; Ms. Holzapfel was one of the other two.
  iv.   In Middlebury's new compensation system, both jobs were placed in grade VT-6.
  v.   Both employees needed to be facile with the ITS department's support ticket system (through which users communicate problems with computers, networks, etc.) because they were both in the group of four library staff who

were notified when an ITS support ticket was identified as pertaining to the Library.

vi. The impact of both employees' exercise of their job functions on the employer's business was similar. Both positions were the kind where if they were done well, no one noticed, but if they were done poorly, everyone noticed.

vii. Both jobs were similar with respect to working independently and without a need for direct oversight.

viii. With respect to extracting data and information from the library database system, Mr. D.F. worked mostly with patron data and the circulation aspects of the library's physical holdings, whereas Ms. Holzapfel worked primarily with bibliographic data that describe physical and online library resources.

ix. Mr. D.F. was primarily responsible for the main service point in the library building. Similarly, Ms. Holzapfel was primarily responsible for ensuring users got access to the library's online resources – on the Middlebury campus, and around the world.

x. Ms. Holzapfel's job required a deep understanding of library acquisitions processes, license agreements, and accounting practices; Mr. D.F.'s job did not.

xi. Mr. D.F.'s job required skill interacting with patrons. Similarly, Ms. Holzapfel's job required skill in communication and maintaining good relationships with the outside vendors who provided resources to the library.

121.    Comparator #3: Mr. M.W., male, age 65, Senior Catalog Associate, as of 2023:

a. Pay:
    i. Mr. M.W.'s pay was likely at least $75,000.
    ii. Ms. Holzapfel's pay (prior to July 2023) was $69,900.

b. Education and experience:
    i. Mr. M.W.'s position required a Bachelor's degree or equivalent experience with broad liberal arts knowledge; six years of previous library experience including experience with cataloging/metadata procedures, library catalogs, and library systems.
    ii. Ms. Holzapfel's position required a Bachelor's degree, and a MLS degree or equivalent experience is preferred; five- to eight-years' experience in academic libraries was required.

c. The core responsibilities were different but had substantially equal requirements relating to skill, effort, and responsibility.
    i. Both jobs enabled users to discover the library's resources.
    ii. Both jobs were highly technical and required the ability to both pay attention to detail and understand how different parts of library systems interact with others, and how those carefully tended details enabled users to find useful things.
    iii. Both jobs acted without supervision.
    iv. Neither job involved the supervision of other employees.
    v. Mr. M.W.'s job focuses exclusively on bibliographic records in the library

22

catalog. In addition to understanding bib records and the library catalog, Ms. Holzapfel's job required that she understand the library's discovery layer; the platforms on which we access online journals, databases, and ebooks; the authentication systems (which enable library users to be identified as associated with Middlebury, no matter where they are in the world, when they land on a publisher's website); and more.

vi.   Ms. Holzapfel's job required a deep understanding of library acquisitions processes, license agreements, and accounting practices; his job did not.

vii.  Ms. Holzapfel's job functions had a much higher impact on library users' abilities to find and access library resources than those of the Senior Catalog Associate.

viii. A significant portion of Ms. Holzapfel's job involved communication and maintaining good relationships with the outside vendors who provided resources to the library; his job involved little communication beyond other library staff.

ix.   In Middlebury's new compensation system, Mr. M.W.'s position was placed in grade VT-5, whereas Ms. Holzapfel's position was in grade VT-6.

122.   Defendant engaged in an unlawful employment practice by discriminating against Ms. Holzapfel with respect to compensation because of sex and age.

123.   Defendant engaged in an unlawful employment practice by violating Ms. Holzapfel's right to equal pay.

124.    Defendant knew or should have known that its actions violated clearly established law.

125.   Defendant acted with malice and reckless disregard in violating Ms. Holzapfel's statutory rights.

126.   The damages sought by Ms. Holzapfel are necessary to remedy the harm she has suffered.

## VIOLATIONS OF THE LAW

### COUNT ONE: TITLE VII
### Pay Discrimination Because of Sex

127.   Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

128.    Plaintiff is female.

129.    Plaintiff performed her job duties in an exemplary manner.

130.    Plaintiff was subjected to compensation discrimination based on sex since at least 2001.

131.    Defendant's conduct violated Title VII.

132.    Specifically, Defendant had paid Plaintiff less than she would have been paid if she was male.

**COUNT TWO: ADEA**
**Pay Discrimination Because of Age**

133.    Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

134.    Plaintiff is 67 years old.

135.    Plaintiff performed her job duties in an exemplary manner.

136.    Plaintiff was subjected to compensation discrimination based on age in 2023 and 2024.

137.    Defendant's conduct violated the ADEA.

138.    Specifically, Defendant paid Plaintiff less than she would have been paid if she was younger than 67 years old.

**COUNT THREE: EPA**

139.    Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

140.    Plaintiff is female.

141.    Plaintiff was paid at a rate that was less than the rate paid to male employees for equal work that required equal skill, effort, and responsibility and was performed under similar working conditions over the course of her employment.

142.    Defendant's conduct violated the federal Equal Pay Act.

## COUNT FOUR: VFEPA, 21 V.S.A. § 495(a)(1)
## Pay Discrimination Based on Sex and Age

143.    Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

144.    Plaintiff is a 67-year-old female.

145.    Plaintiff performed her job duties in an exemplary manner.

146.    Plaintiff was subjected to compensation discrimination based on sex since at least 2001.

147.    Plaintiff was subjected to compensation discrimination based on age since 2023.

148.    Defendant's conduct violated VFEPA, 21 V.S.A. § 495(a)(1).

149.    Specifically, Defendant paid Plaintiff less than she would have been paid if she was a much younger male.

## COUNT FIVE: VFEPA, 21 V.S.A. § 495(a)(7)
## Vermont Equal Pay

150.    Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

151.    Plaintiff is female.

152.    Plaintiff was paid at a rate that was less than the rate paid to male employees for equal work that requires equal skill, effort, and responsibility and was performed under similar working conditions over the course of her employment.

153.    Defendant's conduct violated the equal pay provisions of VFEPA, 21 V.S.A. § 495(a)(7).

## COUNT SIX: TITLE IX

154.    Plaintiff realleges and incorporates by reference each of the allegations contained in all paragraphs of this Complaint as though fully alleged herein.

155.    Plaintiff is female.

156.    Plaintiff was, on the basis of sex, subjected to discrimination in compensation in violation of 26 U.S.C. §1681(a).

157.    Plaintiff was paid less than employees of the opposite sex for equal work on jobs the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions in violation of 34 CFR §106.54.

158.    Defendant's conduct violated Title IX and its implementing regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and the following relief:

1.    A judgment determining that Defendant violated Plaintiff's rights;

2.    Declare that Defendant's conduct violated Plaintiff's rights under Title VII, Title IX, the ADEA, the EPA, and the VFEPA;

3.    Award equitable relief for back pay, benefits and prejudgment interest;

4.    Award compensatory damages in an amount to be determined at trial, plus prejudgment interest;

5.    Award punitive damages in an amount to be determined at trial, plus prejudgment interest;

6.    Award liquidated damages;

7.    Award nominal damages;

8.      Award attorney's fees, including legal expenses, and costs;

9.      Permanently enjoin Defendant from engaging in any employment practice that discriminates on the basis of sex or age;

10.     Require that Defendant mail a letter to all employees notifying them of the verdict against Defendant;

11.     Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

12.     Require that Defendant train all management level employees about the illegality of pay discrimination and unequal pay; and

13.     Grant to Plaintiff such other and further relief as may be just and proper.

Dated at Portland, Maine this 29th day of July 2024

/s/ Barbara Lelli
Barbara Lelli, Vermont Bar No. 2428
Attorney for Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street, 2nd floor
Portland, Maine 04101
Tel (207) 874-0905
Barb@EmployeeRightsLaw.Attorney